IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSHUA WEEDER,    : Civil No. 1:24-CV-546
          :
  Plaintiff,     :
          :
    v.      :
          : (Chief Magistrate Judge Bloom)
LELAND DUDEK, Acting  :
Commissioner of Social Security,[1] :
          :
  Defendant.    :

## MEMORANDUM OPINION

## I. Introduction

Joshua Weeder filed an application for disability insurance benefits on March 16, 2021. Following a hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Weeder was not disabled from his alleged onset date of January 9, 2021, through the date Weeder was last insured, September 30, 2022.

Weeder now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record,

---

[1] Leland Dudek became the Acting Commissioner of the Social Security Administration on February 19, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Leland Dudek is substituted as the defendant in this suit.

and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we conclude that substantial evidence supported the ALJ's findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.    <u>Statement of Facts and of the Case</u>

Joshua Weeder filed for disability insurance benefits, alleging disability due to depression, anxiety, fear of death, panic attacks, and type 2 diabetes. (Tr. 83). At the administrative hearing, he amended his onset date of disability to January 9, 2021. (Tr. 1706). Weeder was 33 years old at the time he was last insured, had at least a high school education, and had past relevant work as a laundry worker and a janitor. (Tr. 22).

The medical record regarding Weeder's impairments[2] revealed the following:  Weeder presented to his family practitioner in January of 2020

---

[2] Because Weeder's appeal focuses primarily on his mental health impairments, we accordingly limit our discussion of the medical records to records involving Weeder's mental health impairments.

complaining of anxiety and depression. (Tr. 551). Weeder reported feeling good overall, sleeping ok, and that his medications were alleviating his panic attacks. (*Id.*). Weeder presented with a cooperative attitude, clear and fluent speech, coherent and logical thought processes, and grossly intact impulse control. (Tr. 552). With respect to Weeder's anxiety, his provider noted that Weeder was "doing very well with [his] current meds, has been stable long term." (*Id.*). At follow up appointments in June and September of 2020, Weeder's provider recorded his anxiety as stable. (Tr. 565, 568).

Weeder underwent a sleep consultation in February of 2021, at which time he described heavy snoring and daytime fatigue. (Tr. 579). The results of the study indicated severe obstructive sleep apnea. (Tr. 582). Weeder's provider ordered a CPAP titration study. (Tr 583). It was also recommended that Weeder attempt to lose weight. (Tr. 584).

In May of 2021, Weeder reported to his family practitioner that his anxiety was well controlled, and he was taking his medications. (Tr. 588). In August, Weeder underwent a mental status evaluation with Dr. Kate Morris, Psy.D. (Tr. 535-43). Weeder reported difficulty sleeping, recent

suicidal ideation, and thoughts of harming his father. (Tr. 536). He further reported excessive worry and apprehension, an excessive fear of dying, and panic attacks primarily at night. (Tr. 537). A mental status examination revealed a good mood, full range of affect, an odd social presentation and poor social skills, coherent and goal-directed thought processes, intact attention and concentration, intact memory skills, and fair insight and judgment. (Tr. 538-39). Based on this examination, Dr. Morris opined that Weeder had mild limitations in understanding, remembering, and carrying out instructions, as well as mild limitations in interacting with others and responding to changes in the work setting. (Tr. 541-42).

In September of 2021, Dr. Kirsten Tollefson, M.D., performed a psychiatric evaluation of Weeder for ongoing medication management and anxiety treatment. (Tr. 663). Weeder reported worsening insomnia and recent thoughts of harming others. (*Id.*). He expressed that his daytime mood was "fine," his anxiety was "brief," and that his day-to-day functioning was not interrupted by his impairments. (*Id.*). Dr. Tollefson noted that Weeder's panic attacks were triggered by his fear of death.

(Tr. 664). A mental status examination revealed a disheveled appearance, euthymic mood, good eye contact, fully responsive affect, and fair insight and judgment. (Tr. 665).

Treatment notes from Weeder's family practitioner indicate that in December of 2021, Weeder's generalized anxiety disorder was stable. (Tr. 697). Dr. Tollefson noted in January of 2022 that Weeder was experiencing increased depression and severe insomnia. (Tr 684). On examination, Weeder had a disheveled appearance, dysthymic mood, and a blunt affect. (*Id*.). However, in February of 2022, Dr. Tollefson noted that although Weeder's insomnia remained severe, his depression was much better and his concentration was intact. (Tr. 686). A mental status examination at this visit revealed a euthymic mood, good eye contact, normal speech and behavior, restricted affect, fair insight, and good judgment. (Tr. 686-87). In March of 2022, treatment notes from Weeder's family practitioner indicated that Weeder's anxiety was stable, and that he was continuing counseling for his mood disorder. (Tr. 701).

In June, Weeder reported that he was doing better, was having fewer thoughts of death, and that therapy was going well for him. (Tr.

1697).   He further reported his insomnia had resolved and he was sleeping well with his CPAP machine. (*Id.*).   However, at a visit in July with Dr. Tollefson, he reported intrusive thoughts and weekly panic attacks, feelings of guilt and hopelessness, poor concentration, and irritability. (Tr. 1694).   On examination, he presented with an anxious mood, blunt affect, and fair insight and judgment.   (Tr. 1695).   Dr. Tollefson noted a "strong preoccupation with death." (*Id.*).

In July of 2022, Dr. Tollefson filled out a mental health impairment questionnaire for Weeder.   (Tr. 721-29).   She noted his specific phobia (fear of death), as well as his persistent depressive disorder and panic attacks. (Tr. 722).   She also noted drowsiness as a side effect of Weeder's medications. (*Id.*).   In describing her clinical findings, Dr. Tollefson noted Weeder's severe preoccupation with death, intrusive thoughts, thoughts of harming others, and several abnormal mental status findings, such as a blunt affect and impoverished thought content. (Tr. 723). Dr. Tollefson further checked off boxes to describe Weeder's symptoms, including feelings of guilt and hopelessness, thoughts of death or suicide,

irritability, fatigability, and detachment from social relationships, among others. (Tr. 725).

Dr. Tollefson opined that Weeder had marked impairments in maintaining attention for two-hour segments; maintaining regular attendance and being punctual; completing a normal workday and workweek; dealing with normal work stress; performing at a consistent pace; and responding appropriately to routine changes in a work setting. (Tr. 727). She further opined that Weeder had mild difficulties maintaining concentration, persistence, and pace; moderate difficulties with understanding, remembering, and applying information; and extreme difficulties interacting with others and adapting or managing himself. (Tr. 728). Dr. Tollefson stated that Weeder would be absent four or more days per month, and that he could perform work on a sustained basis less than 80 percent of the time. (*Id.*).

At a follow up appointment with Dr. Tollefson in August, Weeder reported doing well and denied struggling with anxiety. (Tr. 1692). Dr. Tollefson noted that Weeder was doing well overall, tolerating his medication without side effects, and that he was working through his

issues in therapy. (*Id.*). On examination, Weeder was cooperative, had a euthymic mood, a restricted affect but was "more responsive" than prior visits, goal directed thought processes, and fair insight and judgment. (Tr. 1692-93). It was noted that Dr. Tollefson was leaving, and Weeder would be transferred to a new provider. (Tr. 1692).

Weeder began treating with Nurse Practitioner Charleen Gonden in October of 2022, where he endorsed ongoing intrusive thoughts but reported working through them in therapy. (Tr. 1690). In December, Weeder reported feeling well and stable, that his mood was stable, and his depression was better. (Tr. 1688). A mental status examination at this visit was unremarkable. (*Id.*). In March of 2023, NP Gonden noted that Weeder "continues to report feeling well and psychiatrically stable" and had "no acute concerns." (Tr. 1686). In June, Weeder similarly reported doing well and feeling stable. (Tr. 1684). Mental status examinations at these visits were unremarkable. (Tr. 1684, 1686).

It was against the backdrop of this record that an ALJ held a hearing on Weeder's disability application on July 19, 2022, and a second hearing was held on August 7, 2023, following a remand from the Appeals

Council.[3] (Tr. 38-60, 1700-30). Weeder and a Vocational Expert both appeared and testified at these hearings. (*Id.*). On September 19, 2023, following the second hearing, the ALJ issued a decision denying Weeder's application for disability benefits. (Tr. 7-24). The ALJ first concluded that Weeder had not engaged in substantial gainful activity from January 9, 2021, his alleged onset of disability, through September 30, 2022, the date he was last insured. (Tr. 12). At Step 2 of the sequential analysis that governs disability claims, the ALJ found that Weeder suffered from the following severe impairments: generalized anxiety disorder, agoraphobia with panic disorder, mood disorder, bipolar disorder, specific phobia, personality disorder, and obesity. (*Id.*). At Step 3, the ALJ concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 13-16). Specifically, the ALJ found that Weeder was only moderately limited in the four areas of social functioning. (*Id.*).

Between Steps 3 and 4, the ALJ then concluded that Weeder:

---

[3] The Appeals Council remanded the ALJ's initial decision for failure to consider the opinion evidence of Dr. Tollefson. (Tr. 130-32).

> [H]a[d] had the residual functional capacity to perform light
> work as defined in 20 CFR 404.1567(b) with the following
> limitations. The claimant is limited to occasional climbing on
> ramps and stairs, but never kneeling, never crawling, and
> never climbing on ladders, ropes, or scaffolds. He must avoid
> unprotected heights and dangerous moving machinery. He
> can understand, remember, and carry out simple instructions.
> He cannot perform assembly line work or work that requires
> hourly quotas. He can use judgment to make simple work-
> related decisions. He can deal with occasional changes in a
> routine work setting. He is limited to occasional interaction
> with supervisors and coworkers, and no interaction with the
> public.

(Tr. 16).

In reaching this RFC determination, the ALJ considered the

objective medical record detailed above, the medical opinion evidence,

and Weeder's reported symptoms. With respect to the medical opinion

evidence regarding Weeder's mental health, the ALJ considered the

opinions of the state agency psychological consultants, Dr. Cloutier and

Dr. Taren, and found these opinions unpersuasive. (Tr. 20). These

providers opined that Weeder did not have a severe psychological

impairment that would result in specific mental functional limitations.

(Tr. 89-90, 103-04). The ALJ reasoned that these opinions were not

supported by or consistent with the objective medical evidence, which

documented some abnormal clinical findings during the relevant period and showed that the claimant did have some severe psychological impairments. (Tr. 20-21).

The ALJ also considered the opinion of the examining consultant, Dr. Morris, and found this opinion unpersuasive. (Tr. 21). The ALJ reasoned that Dr. Morris' findings of only mild limitations in certain areas of mental functioning was not supported by or consistent with the record evidence. (*Id.*). Specifically, the ALJ noted the abnormal examination findings during the relevant period, such as an abnormal mood and thoughts of harming himself or others. (*Id.*). The ALJ further discussed that Dr. Morris' opinion was inconsistent with her own clinical observations, such as an odd social presentation and poor social skills. (*Id.*).

Finally, the ALJ considered Dr. Tollefson's opinion, which he found was not fully persuasive. (Tr. 20). The ALJ reasoned that Dr. Tollefson's marked and extreme limitations were not consistent with the objective medical evidence, including behavioral treatment notes that documented Weeder's improvements and his own reports that "everything was going

great." (*Id.*).  Additionally, the ALJ found that Dr. Tollefson did not support her check-box form opinion with any additional explanations or objective findings to support the marked and extreme limitations she found.  (*Id.*).

With respect to Weeder's symptoms, the ALJ found that Weeder's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence.  (Tr. 17).  Weeder testified at the initial hearing that he was let go from his prior employment in 2018 because of panic attacks.  (Tr. 1710).  He reported that his anxiety increased at night, and that he had difficulty sleeping which resulted in him napping during the day.  (Tr. 1715-16).  He testified that his anxiety did not interfere with his ability to perform household chores or take care of his three-year-old son.  (Tr. 1716).  He further reported that his panic attacks were triggered by thoughts of death and other stressful situations.  (Tr. 1718-19, 1721).  Weeder stated that he enjoyed playing video games and was able to concentrate on and complete a video game.  (Tr. 1723).  At the second hearing in August of 2023, Weeder added that his new medications helped him but made him

drowsy, and that being around strangers and the public scared him. (Tr. 49, 55-56).

The ALJ found Weeder's testimony to be inconsistent with the objective clinical findings. (Tr. 17-19). The ALJ recounted the medical evidence, which included Weeder's reports of anxiety, suicidal ideations, difficulty sleeping, and panic attacks. (*Id.*). The ALJ also discussed the 2021 consultative examination, which included Weeder's reported symptoms but also objective findings of coherent thought processes, intact attention and concentration, a full affect, and intact recent and remote memory skills. (Tr. 18). The ALJ ultimately found that Weeder only suffered from moderate impairments in the four areas of social functioning. (*Id.*). He further noted that he specifically accounted for these limitations in Weeder's RFC—a limitation to avoid quotas or assembly work to account for moderate limitations in concentration, persistence, and pace; as well as a limitation to no interaction with the public and occasional interaction with supervisors to account for his moderate limitations in interacting with others. (*Id.*).

Additionally, the ALJ considered Weeder's activities of daily living, which included performing household chores, taking care of his young child, and playing video games. (Tr. 19). The ALJ reasoned that while none of the activities were dispositive, and that Weeder experienced some limitations in his ability to perform daily activities, the evidence as a whole indicated that Weeder could perform a range of work within the RFC on a sustained and continuous basis. (*Id.*).

Having made these findings, the ALJ found at Step 4 that Weeder was unable to perform his past work but found at Step 5 that Weeder could perform the occupations of a cleaner, marker, and garment sorter. (Tr. 23). At the July 2022 hearing, the ALJ included the RFC limitations, including the limitations to no assembly line or quota work, as well as no interaction with the public, in the hypothetical to the vocational expert. (Tr. 1725). After identifying three jobs within the parameters set forth by the RFC, the ALJ specifically asked the vocational expert about the issues not addressed by the Dictionary of Occupational Titles ("DOT"), including the interaction with others, as well as the assembly work and quotas. (Tr. 1726). The vocational expert stated that he was testifying

14

to those issues not addressed by the DOT based on his 40 years of experience. (Tr. 1726-27). Accordingly, the ALJ found that Weeder had not met the stringent standard prescribed for disability benefits and denied his claim. (Tr. 23-24).

This appeal followed. On appeal, Weeder argues that the ALJ failed to: include restrictions in the RFC to account for Weeder's limitations in concentrating, persisting, and maintaining pace; appropriately consider Dr. Tollefson's opinion; properly evaluate Weeder's symptoms; and identify adequate jobs at Step 5. This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III. <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial

evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

16

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters

is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes [him/her] from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must

sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ

must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, considering the entire record,

whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

## C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in March of 2021 after Social Security Regulations regarding the consideration of medical opinion evidence were amended. Prior to March of 2017, the regulations established a hierarchy of medical opinions, deeming treating sources to be the gold standard. However, in March of 2017, the regulations governing the treatment of medical opinions were amended. Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022). Supportability means "[t]he more relevant the objective medical evidence and

supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason." *Mason*, 994 F.2d at 1066. Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016). On the other hand, in cases where no medical opinion credibly supports the claimant's

allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings*, 129 F. Supp. 3d at 214–15.

### D. Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms

When evaluating lay testimony regarding a claimant's reported degree of pain and disability, the ALJ must make credibility determinations. *See Diaz v. Comm'r,* 577 F.3d 500, 506 (3d Cir.2009). Our review of those determinations is deferential. *Id.* However, it is incumbent upon the ALJ to "specifically identify and explain what evidence he found not credible and why he found it not credible." *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014) (citations omitted). An ALJ should give great weight to a claimant's testimony "only when it is supported by competent medical evidence." *McKean v. Colvin*, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015) (citations omitted). As the Third Circuit has noted, while "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 363 (3d. Cir.

2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").

The Social Security Rulings and Regulations provide a framework for evaluating the severity of a claimant's reported symptoms. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. Thus, the ALJ must follow a two-step process: first, the ALJ must determine whether a medically determinable impairment could cause the symptoms alleged; and second, the ALJ must evaluate the alleged symptoms in light of the entire administrative record. SSR 16-3p.

Symptoms such as pain or fatigue will be considered to affect a claimant's ability to perform work activities only if medical signs or laboratory findings establish the presence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this assessment, the ALJ must determine whether the claimant's statements regarding the intensity, persistence, or limiting effects of his or her symptoms are substantiated when considered in light of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p.

This includes, but is not limited to, medical signs and laboratory findings; diagnoses; medical opinions provided by treating or examining sources and other medical sources; and information regarding the claimant's symptoms and how they affect his or her ability to work. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p.

The Social Security Administration recognizes that individuals may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p. Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations set forth seven factors that may be relevant to the assessment of the claimant's alleged symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: the claimant's daily activities; the "location, duration, frequency, and intensity" of the claimant's pain or symptoms; the type, dosage, and effectiveness of medications; treatment other than medications; and other factors regarding the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

## E. The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential.  Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek*, 139 S. Ct. at 1154.  As we have noted, the plaintiff raises four challenges to the ALJ's decision: the ALJ's failure to include adequate restrictions to account for moderate limitations in concentrating, persisting, and maintaining pace; the ALJ's consideration of Dr. Tollefson's opinion; the ALJ's consideration of Weeder's symptoms; and the jobs identified at Step 5.   However, judged against this deferential standard of review, we conclude that substantial evidence supports the ALJ's decision in this case.

Weeder first argues that the ALJ failed to adequately account for his moderate limitations in concentrating, persisting, and maintaining pace.  He asserts that the ALJ's limitations to simple tasks does not address Weeder's ability to perform tasks over the course of a workday.  But the ALJ did not simply limit Weeder to simple tasks; he further

28

limited Weeder to work that does not require an assembly line or hourly quotas, a limitation that the ALJ explicitly determined accounted for Weeder's moderate limitations in concentrating, persisting, and maintaining pace. Such a restriction has been found to be sufficient to account for moderate limitations in concentrating, persisting, and maintaining pace. *See e.g.*, *Mehaffie v. Saul*, 2019 WL 4440055, at *9 (M.D. Pa. Aug. 1, 2019). The plaintiff contends that *Mehaffie* is distinguishable because the claimant in that case did not report difficulties with concentrating and had normal clinical findings. (Doc. 24 at 1). However, as we will discuss further, while Weeder noted concentration difficulties in his function report, the ALJ did not find Weeder's subjective reports entirely credible. Moreover, Weeder's medical records during the relevant period contained both normal and abnormal clinical findings. The ALJ discussed these findings, along with the opinion evidence and Weeder's symptoms, and found that Weeder only had moderate limitations in concentrating, persisting, and maintaining pace. Additionally, while Weeder contends that the ALJ failed to identify evidence to establish that Weeder could perform work

29

on an ongoing basis full time, "the claimant bears the burden to develop the record regarding his or her disability." *Brown v. Comm'r of Soc. Sec.*, 2020 WL 1244186, at *3 (E.D. Pa. Mar. 16, 2020) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Rutherford*, 399 F.3d at 551). Here, Weeder has failed to point to objective evidence in the record to establish that he is more limited than the ALJ determined.

We reach a similar conclusion with respect to Weeder's argument that the ALJ failed to account for his need to nap during the day. While the plaintiff argues that the ALJ did not consider this evidence, the ALJ did note Weeder's testimony that he needed to nap during the day when discussing Weeder's symptoms, as well as the medical evidence showing that Weeder reported insomnia during the relevant period. (Tr. 17). Ultimately, the ALJ determined that Weeder was not as limited as he alleged. Additionally, the ALJ considered the medical evidence as a whole, which included treatment notes showing that Weeder's insomnia resolved during the relevant period. (Tr. 1697). Thus, while Weeder contends that the ALJ failed to include a limitation to account for his need to nap, the ALJ need only include a claimant's credibly established

30

limitations in the RFC.  *See Rutherford*, 399 F.3d at 554.  Accordingly, we conclude that the ALJ's RFC determination is supported by substantial evidence.

Next, Weeder contends that the ALJ erred in his consideration of Dr. Tollefson's opinion and argues that the ALJ should have found this opinion persuasive.  The plaintiff asserts that the ALJ failed to address the supportability and consistency of this opinion as is required by the new regulations.  However, the ALJ explicitly addressed these considerations in his discussion of Dr. Tollefson's opinion.  (Tr. 20).  For example, the ALJ reasoned that Dr. Tollefson's "marked to extreme mental functioning limitations are simply not consistent with the medical evidence of record and nonmedical evidence previously discussed."  (*Id.*).  Particularly, the ALJ noted findings in the record that Weeder was improving and stable, and that he reported "everything is going great."  (*Id.*) (citing Tr. 1686).  The ALJ also reasoned that Dr. Tollefson filled out a check-box form opinion and did not support this form with additional findings or explanations to establish the level of limitation she found.  (*Id.*).

While the plaintiff contends that the ALJ exclusively relied on Weeder's reports of feeling well to discount this opinion, reading the decision as a whole, it is clear that the ALJ considered all of the objective medical evidence of record in making his determination. (*See* Tr. 13-21). As the Court of Appeals has explained, "[t]he ALJ need not 'use particular language or adhere to a particular format in conducting his analysis.' The only requirement is that, reading the ALJ's decision as a whole, there must be 'sufficient development of the record and explanation of findings....'" *Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 262 (3d Cir. 2006) (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)). Here, the ALJ discussed this evidence at length, including both abnormal and normal clinical findings. (*Id.*).  These findings included Weeder's reports of insomnia, thoughts of harming others, and anxiety, as well as normal mental status findings such as a euthymic mood, fully affect, normal thought processes, and intact attention and concentration. (*See* Tr. 17-19).  Ultimately, while the ALJ acknowledged the abnormal findings during the relevant time, including those established by Dr.

32

Tollefson, the ALJ explained that the record as a whole did not demonstrate that Weeder was as limited as Dr. Tollefson found.

Additionally, while the plaintiff argues that the ALJ discounted this opinion because it was a check box form, the ALJ further explained that Dr. Tollefson did not support this check box form with additional explanations or findings to support her conclusions. This is sufficient reasoning, in our view, for us to conclude that the ALJ's treatment of Dr. Tollefson's opinion is supported by substantial evidence. *See e.g., Zonak v. Comm'r of Soc. Sec.*, 290 F. App'x 493, 497 (3d Cir. 2008) (affirming rejection of a medical opinion that "was provided on a check-box form and no reasons were given in support of [the provider's] conclusion[.]"); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). Accordingly, we find no reason to remand on this basis.

Next, the plaintiff asserts that the ALJ erred in his consideration of Weeder's symptoms. Specifically, the plaintiff takes issue with the ALJ's consideration of his ability to play video games and take care of his

33

young child, arguing that these activities do not establish an ability for Weeder to perform work on a sustained basis. At the outset, the ALJ was entitled to consider Weeder's abilities to perform activities of daily living in assessing Weeder's subjective complaints. *See Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 118 (3d Cir. 2012). But the ALJ did not exclusively rely on these activities to conclude that Weeder was not disabled. Rather, the ALJ explicitly acknowledged that Weeder had some difficulty with activities of daily living, but that his ability to perform activities on some level, taken together with the entire record, suggested Weeder could perform work within the parameters of the RFC. (Tr. 19). Accordingly, we conclude that the ALJ's consideration of Weeder's symptoms is supported by substantial evidence.

Finally, Weeder challenges the ALJ's findings at Step 5, arguing that the jobs identified by the vocational expert conflict with the ALJ's RFC determination. At Step 5, the ALJ found that Weeder could perform the jobs of a cleaner, marker, and garment sorter. (Tr. 23). The plaintiff argues that the cleaner job conflicts with the ALJ's restriction that Weeder have no interaction with the public. He further argues that the

marker and garment sorter jobs are inconsistent with the ALJ's restriction on assembly or quota work. Additionally, he argues that these jobs are obsolete.

As to the plaintiff's argument that these jobs are in conflict with the RFC limitations, we first note that "[the Commissioner can [] rely on testimony from a VE to meet its step-five evidentiary burden." *Zirnsak v. Colvin*, 777 F.3d 607, 616 (3d Cir. 2014) (citing 20 C.F.R. § 404.1566(e)). This is so where a common issue arises and the "VE's testimony conflicts with other sources of information relied on by the Commissioner, namely the DOT." *Id.* In this scenario, an ALJ is required to resolve any discrepancy or conflict by: "(1) ask[ing], on the record, whether the VE's testimony is consistent with the DOT, (2) 'elicit[ing] a reasonable explanation' where inconsistency does appear, and (3) explain[ing] in its decision 'how the conflict was resolved.'" *Id.* (quoting *Burns*, 312 F.3d at 127).

Here, the ALJ explicitly questioned the vocational expert on any inconsistencies between the DOT and the vocational expert's testimony. (Tr. 1726-27). At the July 2022 hearing, after posing a hypothetical to

35

the vocational expert containing the restrictions to no assembly line or quota work and no interaction with the public, the vocational expert identified the above three occupations. (Tr. 1725-26). The ALJ then asked about issues that are not addressed in the DOT; specifically, interaction with others, assembly work, and hourly quotas. (*Id.*). The vocational expert responded that he offered his opinion on those issues based on over 40 years of experience. (*Id.*).

On this issue, we note that the plaintiff's counsel did not object to the qualifications of the vocational expert at the administrative hearing. Moreover, as we have explained, the ALJ was entitled to rely on the vocational expert's testimony. *Zirnsak*, 777 F.3d at 616. The plaintiff's belated contention that the jobs identified as Step 5 "appear to" conflict with the restrictions in the RFC is unavailing and does not require a remand.[4] This is particularly so where the ALJ specifically addressed

---

[4] Even if we were persuaded by the plaintiff's contention that the cleaner job was inconsistent with the ALJ's restriction to no interaction with the public, as the DOT description requires "render[ing] personal assistance to patrons," *see* DOT 323.687-014, 1991 WL 672783, the ALJ identified two other jobs with over 300,000 and 200,000 national positions, respectively. This would satisfy the Commissioner's requirement to

the issues the plaintiff now contests with the vocational expert at the hearing. *See e.g.*, *Pollock v. O'Malley*, 2024 WL 4803530, at \*18-19 (M.D. Pa. Nov. 15, 2024) (finding no basis to remand where the ALJ explicitly addressed any inconsistencies with the DOT with the vocational expert).

Nor are we persuaded by the plaintiff's contention that the marker and garment sorter jobs are "obsolete." The plaintiff cites to a variety of out-of-circuit caselaw questioning the relevancy of the DOT and its relation to the "O\*NET." (Doc. 12 at 12-13). Specifically, the plaintiff contends that the vocational expert's reliance on the DOT should not warrant a presumption of reliability. (*Id.*). However, as one court in this district has noted, courts in our circuit "have been hesitant to reject the testimony of Vocational Experts relying upon the DOT in favor of the descriptions on O\*NET, given the fact that 'Social Security Ruling 00-4P sets forth that the relevant inquiry is whether VE testimony is consistent with the DOT.'" *Pollock*, 2024 WL 4803530, at \*19 (collecting cases). We agree with this body of caselaw and conclude that the ALJ fulfilled his

---

identify jobs that exist in significant numbers in the national economy. *See Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013).

requirement under the controlling regulations to identify and explain any conflicts between the jobs identified and the DOT, and we find no basis for remand.

Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision will be affirmed.

## IV.   Conclusion

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 18th day of March 2025.

_s/ Daryl F. Bloom_
Daryl F. Bloom
Chief United States Magistrate Judge

38